Denver, South Park & Pacific R. R. Co. v. Pickard.

1. Where negligence is the ground of an action, it devolves on the plaintiff to trace the fault for his injury to the defendant, and for this purpose he must show the circumstances under which it occurred. If from the circumstances it appears that the fault was mutual, or that contributory negligence is fairly imputable to him, he has, by showing them, disproved his right to recover.

2. An attempt to get upon a railway train while in motion, without a necessity for doing so, induced by the conduct of the employees of the company, and without any invitation to do so from its agent acting in the line of his duty, precludes the passenger from the right to recover for the injury which may be thereby occasioned.

3. The refusal to stop a train, nor the custom of those in charge of the train to slacken its speed at the particular station, in order to take on passengers without coming to a stop, will excuse the negligence of the party; nor will a mere permission from the company's servants to do a dangerous act relieve the injured person from the responsibility for its consequences.

4. When it affirmatively appears from plaintiff's own evidence that the want of due prudence upon his part was the proximate cause of the injury complained of, a motion for a non-suit should be sustained.

*Appeal from District Court of Chaffee County.*

The facts are stated in the opinion.

Messrs. Teller and Orahood, for appellant.

Messrs. Browne and Putnam, for appellee.

Beck, C. J.  This was an action against the railroad company for damages alleged to have resulted to the plaintiff from its negligence.

Judge Cooley says: "Where negligence is the ground of an action, it devolves on the plaintiff to trace the fault for his injury to the defendant, and for this purpose he must show the circumstances under which it occurred. If from these circumstances it appears that the fault was mutual, or, in other words, that contributory negligence is fairly imputable to him, he has, by showing them, disproved his right to recover." Cooley on Torts, p. 673.

The plaintiff's injury, complained of in this case, was serious and permanent, and by the verdict of the jury and judgment of the court he was awarded, as damages therefor, the sum of $25,000.

The first question presented for our consideration is, whether the court erred in denying the motion for non-suit, interposed by defendant's counsel, at the close of plaintiff's direct testimony.

A proper determination of this question involves the decision of two other legal questions arising upon the facts in evidence, viz.:

*First.* Was the station, Divide, where the injury was received, a regular passenger station on the defendant's road, where its trains were legally obliged to stop for passengers?

*Second.* Did the legal relation of carrier and passenger subsist between the parties at the time of the injury?

In support of the proposition that Divide was a regular passenger station, plaintiff introduced in evidence, against the objections of the defendant, a time-table issued by the officers of the railroad company, and which went into effect on the day of the accident. The heading was as follows:

"The Denver, South Park & Pacific Railroad time-table, No. 37. To take effect Thursday, October 21, 1880,

at 12:15 o'clock A. M. For the government of employees only. The company reserves the right to vary therefrom at pleasure."

The table contains the names of the various stations upon the line of defendant's road, including the station Divide, with the times of the arrival of trains thereat. In a note at the bottom it is stated that flag stations are designated by a star. The station in question is not so marked.

While the evidence was admissible, in our judgment, in connection with other facts bearing upon the question, it falls far short of proving the fact sought to be established.

It does not purport to be an advertisement for the information of the traveling public, but, on the contrary, every person into whose hands such card may fall is advised against such a conclusion, and that it cannot be relied upon for such purposes.

In *Beauchamp v. I. & G. N. R'y Co.* 56 Tex. 239, it was held that a time-table which, on its face, announces that it is for the government and information of employees only, and, in terms, reserves to the company the right to vary therefrom at pleasure, is not admissible in evidence in a suit for damages against the company for not stopping at a place mentioned therein. Perhaps that ruling is not applicable here, owing to the fact that other evidence was submitted upon the same point.

Plaintiff testified that the company's station agent, at Buena Vista, where plaintiff resided, and where he held the office of postmaster, gave him one of these cards, on the day preceding the accident, to be used in making up the mails. Joseph Nevitt, deputy postmaster at Divide, testified that Divide was a regular station, but his answers to a few questions disclose his ignorance of the subject.

Question. "Did the trains always stop there?"

Answer.    "Whenever they felt inclined."

Question.    "What do you call a regular station, and a flag station?"

Answer.    "I am not railroad man enough to define it."

Question.    "And you think you are able to say positively that was not a flag station?"

Answer.    "I am, by their own actual time card."

He further testified that defendant's master of transportation, John McCormick, had previously declared to him that Divide was a regular station; that it was the duty of engineers to stop their trains there, and requested the witness to report those who did not do so.

It does not appear that the declarations of McCormick had been communicated to the plaintiff, so they certainly did not influence his conduct.    Nor did the fact that one of these cards was sent to him for the special purpose mentioned, by an employee of the defendant, previous to his injury, warrant him, in view of the precautionary advice therein contained, in relying upon it for any other purpose.

But the plaintiff's testimony disclosed other facts with which he was acquainted, and which have an important bearing on the question.

There was at this station neither a station-house, ticket-office, nor waiting-room.    No tickets were sold here for any point on the line, nor was there a station agent or a railroad employee in the place.    There was a platform beside the track, such as were used at other stations, but even this did not belong 'to the company, the witness Nevitt stating that it was his own private property.    The latter fact is not material, however, since the company used it when it had occasion to do so.    Plaintiff's witnesses all agree that trains did not regularly stop at this station, some of them saying it was necessary to flag them to have them stop.

We consider the testimony wholly insufficient to show

that Divide had been advertised either to the public or to the plaintiff as a regular passenger station. It certainly does show that it was not used as such.

Regarding the relation which the plaintiff bore to the railroad company, his counsel insist that going upon the platform with the *bona fide* intention of taking the train and paying his fare, consummated the relation of carrier and passenger between the parties. It is conceded that he held no ticket, but he testified to his ability to pay his fare, which counsel say was sufficient.

In support of the proposition that plaintiff sustained the relation of a passenger, the following is quoted from Shearman & Redfield on Negligence, sec. 262: "Any acts indicating on the one side an offer or request to carry or to be carried, and on the other an acceptance of such offer or request, are sufficient. It is not necessary, in order to create the relation of carrier and passenger, that the latter should have actually entered the vehicle, much less that it should have started on the journey without him."

Other parts of the same section are germane to the facts of the present case, viz.: "A passenger is a person who undertakes, with the consent of the carrier, to travel in the conveyance provided by the latter.   *   *   * Where the carrier provides a waiting-room for passengers, entry into that room, with intent to travel under the carrier's charge, is sufficient to give the rights of a passenger. Where it is the practice of the carrier to stop for passengers when hailed, the fact that he stops for a passenger hailing him is sufficient evidence that he accepts such person as a passenger, and from that moment the relation begins."

The rule of this section would not seem to include a case where no waiting-room was provided, no tickets sold, and where the carrier did not stop for the passenger, and where the plaintiff is unable to testify or prove

that the carrier was aware of his intention to get upon the train.

Counsel also quote to the same proposition the following detached sentences from Hutchinson on Carriers:

" Payment of fare or purchase of ticket not required." Secs. 565–8. " Waiting at stations for expected train is enough." Sec. 559. " Relation arises without privity of contract." Sec. 567. " Averring a readiness to pay fare is sufficient." Sec. 565, note 2.

A reference to the foregoing sections shows that these general expressions are materially qualified by the context, for example, sec. 465: " Taking his place in the carrier's conveyance, with the intention of being carried, creates an implied agreement upon the part of the passenger to pay when called upon, and puts him under a liability to the carrier, from which at once spring the reciprocal duty and responsibility of the carrier."

Sections 566, 567, relate to the carrying of persons gratuitously and upon free passes.

The authorities referred to in note 2, sec. 565, relate to cases where passage is taken without prepayment.

It is apparent that these citations do not sustain the proposition.

The rules cited in Thompson's Carriers of Passengers, p. 43, are equally inapplicable to the facts in the case before us. It is there said that payment of fare is not necessary to create the relation, but that going into the depot or waiting-room of a railway company and waiting for the means of conveyance, with a *bona fide* intention of becoming a passenger, or upon a steamboat, in good faith, to take passage thereon, creates the relation, although no fare has been paid.

But it is claimed that a custom existed at this station, for which the defendant is responsible, and which, in connection with the facts proven, brings the case within the rules of the foregoing authorities.

It is alleged that it was the practice of the defendant's employees to slow up the trains in passing this station so that passengers could get on and off, as they desired, and that travelers, knowing or becoming informed of the custom, frequently availed themselves of it; that the plaintiff had been told of this custom; also that trains frequently passed by without stopping, and that he must be prepared to get aboard the train while in motion.

It is argued that a custom to slacken speed for the purpose of enabling passengers to get on and off moving trains is equivalent to an invitation to do so, and renders the carrier liable for injuries sustained in an attempt to comply therewith.

The substance of the plaintiff's testimony on this point was that several persons residing at Divide told him that trains frequently passed without stopping, and that he would have to look out and get on while the train was in motion; that passengers frequently had to do this.

Joseph Hewett swears that he told plaintiff that there had been occasions when the train passed by and left passengers, and it would be well for him to be on the alert. He also stated that he knew of several instances where persons had got on and off moving trains at the station, but did not know whether it was done with the assent of the officers of the company or not.

O'Neil, who had resided there ever since the road was built, said he had witnessed several similar instances, but did not know whether it was a regular custom or not. He had noticed that the trains slackened up to take on the mail.

McArthur jumped off the train once at Divide while it was in motion, and at another time was carried two miles past.

Cram knew nothing of the custom, but mentioned two instances wherein trains failed to stop for him at this station.

No witness was able to swear to an instance where a

passenger got on or off a train in motion by invitation or direction of defendant's employees. This being the state of the proof, and it appearing that the slowing up may have been for other purposes than those alleged, we think the proof of the custom mentioned is insufficient to establish it. It remains to inquire whether the facts and circumstances, transpiring immediately prior to the accident, justified the plaintiff's attempt to jump upon the train.

Deputy Postmaster Russell accompained the plaintiff to the platform, carrying the mail to be sent off, and a lantern to signal the train.

The train arrived from Denver that evening at 6 o'clock.

After it appeared around the sharp curve to the north of the station, Russell swung his lantern across the track, as a signal to stop, and one whistle was blown from the engine, which plaintiff says was in response to the signal. The train slowed up and Russell set down the lantern, and, picking up the mail sack, held it out for the mail agent as the train passed by but he failed to get it. The train did not stop, and plaintiff attempted to get upon the front end of the rear car as it passed the platform. He caught the iron railing with his left hand, the iron handle on the end of the car with his right, and put his right foot on the car step; just at that moment, and as he was about to raise to the platform, the car was violently jerked by letting off brakes or putting on steam, and plaintiff was hurled underneath the platform, and his left arm so crushed by the rear truck which passed over it, as to require amputation.

The authorities say that circumstances may exist which will make it a question for a jury, whether an attempt to get upon a train in motion constitutes such negligence on the part of a passenger as to bar an action for injuries received in such attempt.

Judgments for damages have been sustained in such cases, where there has been gross misconduct on the part

of the railroad company, as in failing to give necessary time for passengers to get upon the train before setting it in motion; failing to come to a full stop at a regular station where passengers are to be taken on or let off, and where great emergency exists for passengers to proceed on their journey; also, where invitations or directions are given to passengers, by railroad employees, or by existing customs of railroad companies, to get on and off their trains while in motion. But these are cases where plaintiffs were clearly entitled to the rights of passengers; and, moreover, the trains were moving very slowly in all such cases.

In reviewing the case made by the plaintiff, we are of opinion that it does not contain the elements essential to a recovery. It does not appear, except inferentially, that any one upon the train was aware of the plaintiff's desire to get aboard. As the train swept by, the plaintiff neither spoke nor made sign to any one of the company's train men of his desire to get on, nor did he receive any encouragement to do so, unless by the checking of speed as the train approached.

He did not even prove that the whistle sounded from the engine was the stop signal in use by the company. The witness Glassbrook, who had been a railroad employee, and who was present and witnessed the accident, stated that he heard the station signal and saw the lantern waived, but did not remember any response to the flagging.

Concerning the rate of speed at which the train passed the platform, the plaintiff and his witnesses made different estimates. The plaintiff's estimate was six to eight miles per hour; Joseph Hewitt's estimate five miles per hour, and O'Neil's four and a half to five.

As already mentioned, it seems to have been running so fast that the mail agent on board failed to get the mail held out to him.

The proof failing to show an obligation to stop regu-

larly at this station, or that the plaintiff's desire to become a passenger was known to the company's agents, it is difficult to perceive wherein consists such palpable misconduct on the part of the defendant as to render it liable in damages, or to justify the risk to life or limb assumed by the plaintiff.

The plaintiff had some previous experience in getting on and off trains while in motion, and says he knew the danger attending such efforts. He knew that the sudden checking and starting was accompanied with more or less jerking of the coaches, a fact recognized by his witnesses, and it is very doubtful if the circumstances of emergency under which he acted would have justified a much less degree of risk than he took.

He came to Divide the day previous in a buggy, and concluded to return by train. Being postmaster at Buena Vista, his anxiety to return home was on account of his official business, which was not well understood by those left in charge of the office. He stated, however, that the drive by horse and buggy could be accomplished in two hours, and that he presumed he could have gotten a horse as well as not and have driven home.

In Hutchinson on Carriers, sec. 641, it is said: "Thus nothing is more universally agreed upon, perhaps, than the attempt to get upon a railway train whilst in motion without a necessity for doing so, induced by the conduct of the employees of the railway company, and without an invitation to do so from its agent acting in the line of his duty, precludes the passenger from the right to recover for the injury which may be thereby occasioned."

That the necessity for taking such risk, and that circumstances relied upon in the present case as constituting an invitation to get on, do not bring the case within the exceptions mentioned, is shown by a subsequent portion of the section. "Nor will the refusal to stop the train, nor the custom of those in charge of the train to slacken its speed at the particular station, in order to take on

passengers without coming to a stop, excuse the negligence of the party.  *  *  *  If it had adopted a practice of receiving its passengers while in motion, it would be reckless conduct on the part of the company, or of those in charge of its trains, which would not justify or excuse the equally reckless imprudence of the injured party."

The authorities which recognize the right of passengers, under certain circumstances, to rely and act upon the invitations and directions of duly authorized agents of railway companies, limit the doctrine to cases which do not involve the element of recklessness.     Thus, in Pierce on Railroads, p. 329, the author says: "But, notwithstanding such direction, invitation or assurance, the plaintiff will not be excused in following it if the act involves a reckless exposure of himself, or is one which a man of common prudence would not do.     A mere permission from the company's servants to do a dangerous act does not relieve the injured person from the responsibility for its consequences."

Analogous cases, held proper for the consideration of juries, are cases wherein the relation of passenger and carrier clearly appears, and the trains are moving very slowly.

If a passenger holds a ticket entitling him to alight at a particular station where the train stops, but not long enough to afford him a reasonable time to alight, and he attempts to do so before the motion has become at all rapid, and while the act would not seem dangerous to a man of ordinary prudence, but nevertheless he is injured thereby, it is held that he is entitled to damages.     The basis of action is the flagrant breach of duty on the part of the carrier.     *I. C. R. R. Co. v. Able*, 59 Ill. 131.

Where a passenger holding a through ticket arrived at the station where the connecting train was standing, but without giving him time to change cars it started out,

and in his effort to get aboard he fell and was injured, the supreme court said it was a proper case for the consideration of a jury. The motion of the train, in this case, was so slow as to be only distinctly perceptible to those alongside of it. *Johnson v. W. C. & P. R. R. Co.* 70 Pa. St. 357. See, also, *Filer v. N. Y. C. R. R. Co.* 49 N. Y. 47; *Phillips v. R. & S. R. R. Co.* id. 177.

A concise statement of the rule which has been favorably cited by the courts is when a passenger is called upon to choose between two evils to which the neglect of the company has exposed him, one of which presents some degree of danger, but not such as he may not, without imprudence, encounter; if by adopting that alternative he suffers any injury, it is the proper subject of an action against the company. Kelley, C. B. 3 Law Rep. Ex. 150.

It is impossible to hold that the facts disclosed by the plaintiff's witnesses bring his case within the rules announced. On the contrary, we think it affirmatively appears, from his own evidence, that the want of due prudence upon his part was the proximate cause of the injury complained of. The motion for non-suit, therefore, should have been sustained. *Behrens v. K. P. R'y Co.* 5 Colo. 400.

When the testimony on the part of the defendant is considered, the circumstances are still more unfavorable to the cause of the plaintiff. The train men all concur that the swinging of the lantern was not seen at all, and that no stop signal was sounded, such a signal being two short blasts of the steam whistle. They further state that Divide, up to that time, was used as a flag station, and not as a regular passenger station.

The conclusion upon the whole case is inevitable, that the plaintiff, knowing the danger of his position, failed to exercise ordinary prudence, and for that reason is not entitled to recover.

Even if recovery could be sustained, the damages awarded are manifestly excessive, and the judgment would have to be reversed for that reason alone.

As to the instructions, it is only necessary to say that, in so far as they are inconsistent with the views above announced, they are held to be erroneous. Judgment reversed.

*Reversed.*